In the matter of TRANSPORT CLEAR-INGS–MIDWEST, INC., Bankrupt.

H.T. POINDEXTER & SONS MER-CHANDISING CO., Claimant,

v.

Mendel SMALL, trustee in bankruptcy, Respondent.

Bankruptcy No. 78–01179–B–W–4.

United States Bankruptcy Court, W.D. Missouri, W.D.

June 8, 1984.

lands, Schmitt & Gorman, Kansas City, Mo., for claimant.

James C. Mordy, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., for respondent.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ALLOWING THE CLAIMANT'S CONTESTED CLAIM AS A PRIORITY EXPENSE OF ADMINISTRATION IN THE SUM OF $5,900.00

DENNIS J. STEWART, Bankruptcy Judge.

Three claims have been filed against the within bankruptcy estate by H.T. Poindexter & Sons Merchandising Company. The first claim was filed on May 31, 1979, for the sum of $251,674.60, the amount of the then remaining rent payments under the lease between claimant and bankrupt. Two more claims were filed on July 1, 1981. Each of these two claims is substantially identical in nature. One is asserted as a priority claim under section 64a(1) of the Bankruptcy and the other has been filed alternatively as an unsecured, nonpriority claim. Neither of these two claims sets forth any specific amount claimed, but they are apparently based upon allegations of negligence of the trustee and his agents in inflicting damages upon the claimant's premises.

A hearing on the claims was conducted by this court on January 5, 1984. Pursuant to stipulation at the hearing, the first claim was allowed as a general unsecured claim in the amount of $65,071.20, the amount of the rent reserved by the lease, without acceleration, for the year next succeeding the date of surrender of the premises to the landlord.[1] This is the maximum amount allowable on the claimant's claim for damages resulting from the rejection of the unexpired lease according to the provisions of section 63a(9) of the Bankruptcy Act. The trustee challenges the portions

Ford R. Nelson, Jr., Roy R. Darke, Foster C. Collins, Dietrich, Davis, Dicus, Row-

---

1. The date of surrender of the premises, according to the evidence in this matter, was June 30, 1981.

of the other two claims which are for damages allegedly inflicted by negligence, as opposed to rent. It is his contention that these claims are not properly allowable and that, even if allowable in whole or part, they are not properly allowable as priority administrative expense claims under section 64a(1) of the Bankruptcy Act.

## Findings of Fact

By means of a written lease made on February 2, 1977, the claimant, as lessor, leased to Transport Clearings-Midwest, Inc., as lessee, a portion of the first floor of a building located at 801 Broadway, Kansas City, Missouri, for a term of six years, one month and fourteen days, beginning February 15, 1977, and ending on March 31, 1983. This lease provided for a total rental of $395,849.80, payable in 73 monthly installments of $5,422.60, due and payable on the first day of each month of the term. On September 21, 1978, an involuntary petition for bankruptcy was filed against the bankrupt corporation. Thereafter, on October 2, 1978, the bankrupt corporation filed a petition for an arrangement under chapter XI of the Bankruptcy Act. Transport Clearings-Midwest, Inc., remained a debtor-in-possession under chapter XI for two years. On September 18, 1980, this court entered an order converting the chapter XI case to a straight bankruptcy case under chapter VII and appointing the respondent, Mendel Small, as the trustee in bankruptcy. By a sublease made and entered into on May 18, 1980, prior to the appointment of the trustee and while Transport Clearings-Midwest, Inc., was yet a debtor-in-possession under chapter XI of the Bankruptcy Act, Transport Clearings-Midwest, Inc., subleased to Carrier Credit and Collection, Inc., all of the leased premises covered by the abovementioned lease, except the rooms used by Transport Clearings-Midwest, Inc., for its general manager's office, its executive secretarial and bookkeeping office, its conference room, the corridors and restrooms adjacent to that office, and the area in the southwest corner of the leased premises between the west wall of the leased premises and the west wall of the conference room projected south to the south wall of the leased premises. On May 29, 1981, the trustee in bankruptcy sent a letter notifying the claimant that, after June 30, 1981, the trustee would no longer use and occupy the previously occupied portion of the first floor of 801 Broadway or the storage space in the basement of that building.

Transport Clearings-Midwest, Inc., paid the claimant the sum of $5,422.60 for each of the 43 successive months beginning in March 1977 and ending with September 1980. For each of the nine months beginning with October 1980 and ending with June 1981, the trustee paid claimant $5,422.60 for the continued use and occupation of the formerly leased premises. Neither Transport Clearings-Midwest, Inc., nor the trustee has paid claimant any amount for any period subsequent to June 30, 1981. On Saturday, June 28, 1981, Carrier Credit and Collection, Inc., which had acted under the direction and control and supervision of the trustee in bankruptcy, moved out of the premises that had formerly been leased by Transport Clearings-Midwest from the claimant. Since that date, neither Carrier Credit and Collection, Inc., nor the trustee has occupied any part of the formerly leased premises. The subject matter of the claim in this case pertains to the damage allegedly inflicted on the premises during their use and occupancy by Carrier Credit and Collection, Inc., under the control and supervision of the trustee in bankruptcy. Thus, in a claim filed by the claimant on May 29, 1981, it was asserted by the claimant that:

"(u)pon June 30, 1981, inspection of said premises, claimant discovered damages to said premises, including removal of required improvements. Upon information and belief, claimant states that said damage was caused by the negligence of trustee or his agents and constitutes waste.

\*   \*   \*   \*   \*   \*

"(Claimant) asserts this claim in full as a priority claim under section 64a(1) of the

Bankruptcy Act, but has filed its other proof of claim in the alternative as a general unsecured claim."

The court, in setting its hearing on the alternative claims has, as is justified by their content, treated them in substance as one claim.

The evidence which was adduced at the hearing tended to show that, in some respects, the contents of the preexisting lease may be relevant to disposition of the matter at bar. As pertinent, the lease obligated the lessor (claimant) to provide at its own expense certain renovations and alterations to the leased premises. These renovations and alterations obligated the lessor not only to construct new restroom and lounge facilities, but also to install a new 40 ton air conditioning system and duct work for the work area, a supplementary sprinkler system, and new partitions to replace older partitions. It was also contemplated that the lessor would rehang the exit doors, resurface the dock and vestibule and replace the dock steps. Some $10,000 was to be contributed for the construction of a new computer room and the installation of a suspended ceiling and of carpet "with 100% nylon looped office type (texture)" and of tile in the restrooms, lounge area and hallway. It was contemplated that the walls and columns would all be painted. The obligations of the lessee which were imposed by the terms of this lease were to "provide all electrical labor and materials required in the entire leased premises" and to

"remove existing fixtures in work area; repair existing fixtures in office areas; furnish and install complete electrical service including, but not limited to, separate meter for lessee's electricity, air conditioning and ventilation wiring, 272 $2' \times 4'$ recessed flourescent light fixtures to provide 100 candle power light at desk heighth, 84 duplex outlets at 42 locations or the equivalent thereof, transformer and feeder and all other electrical work, lighting or equipment required for lessee's operation."

According to the uncontradicted testimony adduced by the claimant in the course of the hearing, the description "84 duplex outlets at 42 locations" was intended to refer to 42 power poles which would contain two electrical outlets on each pole. These provisions of the lease agreement are said by the parties to bear upon the level of use and activity which was within the contemplation of the parties at the time they entered into the lease.

The evidence of damage inflicted to the premises, as those premises existed at the time of the trustee's agent quitting occupancy of the premises is extensive in volume. This evidence purports to show that, with court approval, Carrier Credit and Collection, Inc., became the trustee's agent for performing the tasks of collection and disposition of the uncollected freight bills which were on file with the bankrupt corporation and that it had sole and exclusive use of the premises from October 1980 to June 28, 1981. At the end of that period of time, on July 1, 1981, the lessor (claimant) had photographs taken of the premises. These photographs demonstrated the existence as of that date, of broken drywall, stains on the walls, broken ceiling tiles, stains, tears and ripples in the carpet and missing doors and switchplates. There is virtually no question that nearly all of this damage was caused by the action of the trustee's agents in removing the equipment which had been used by them from the premises. Admittedly, they did not take some precautions which might have been taken in the removal, such as placing boards or other protective paths over the carpet to prevent the damage done by rolling carts and dollies. It was further demonstrated that damage to the premises resulted from the removal of the 42 power poles from the premises; and there was also varying damage to 142 ceiling tiles.

Evidence as to the cost of the repairs which was adduced by the claimant tended to show that such was approximately $9,863.00. This evidence was based on estimates and, further, tended to be contradicted by the testimony of Robert M. Line, President of the Line Construction Compa-

ny, to the effect that the cost of repairs necessary to restore former value was $4843 as measured by 1981 costs. In addition, as of the present time, all of the 14 power poles which had been taken and not returned as of the time of the hearing have been returned. But they are not yet re-installed. The estimated cost of the reinstallation is about $50 each. Certain wooden pallets of uncertain value and uncertain number are also missing.[2]

Additionally, the claimant's chief executive officer, W.R. Poindexter, testified that the property had a difference in value of some $100,000 resulting from the damages which are above described. He stated that, after the renovations had been made which were required by the lease between the parties, the building provided a "first rate office space"; that the value of the building before the damages were inflicted was $1,450,000; that the current value of the building is $1,350,000; that he recently contracted to sell the building plus the parking lot for a total selling price of $1,500,000; that the parking lot had some 15,000 square feet in it; and that it had a value itself of some $150,000.

The evidence which was adduced by the trustee tended to demonstrate that, during the tenancy of his agent, the Carrier Credit and Collection, Inc., reasonable care was taken of the premises. According to the testimony of Richard High, the managing officer of the agent corporation, he was physically present in such capacity during the period in question. He stated that, in such capacity, he had made every reasonable effort to prevent damage to the premises by promulgating rules to his employees and enforcing them. He further testified that, with respect to at least a portion of the nylon carpet which had been install-ed on the premises, the quality was not such that it could withstand the traffic of regular office work and consequently had extensively rippled prior to the time when the trustee took over the premises.[3] He further stated that nearly all the tearing of the carpet had been done before the time when the trustee took over the premises. Some damage, according to his testimony, was admittedly attributable to the work which was carried out in order to evacuate the premises at the end of June 1981. At this time, the uncontradicted evidence shows, no boards or other solid bridges were made over the carpet over which carts and dollies could roll. Only some heavy brown paper was used, causing some creasing of the carpet. Despite Mr. High's efforts to prevent employees from making coffee and cigarette stains on the carpet, he admitted that sometimes it happened, although a rule was finally invoked which greatly restricted smoking and coffee drinking, except in certain defined areas. Some difficulty was also had with employees throwing cokes and other liquids in waste baskets, resulting in some staining of the carpet, both during the time of the trustee's tenure and prior thereto. It was Mr. High's belief, however, and that of one of his chief lieutenants, who was called to testify in the hearing of this matter, that such damage as was done was ordinary wear and tear and therefore not attributable to negligence. It was admitted that there was no filler plastic in the waste-baskets, but otherwise, Mr. High and his assistant believed that the damage which was done was relatively minor—and consistent with the "normal routine of traffic" of 200 office employees. There was evidence adduced through these witnesses to the effect that some prevention and pro-phylactic measures were repeatedly taken

2. It is said in the posthearing briefs that these pallets were worth about $10 each. But their number and quality is not otherwise evidenced with any certainty.

3. In rendering this testimony, Mr. High purported to qualify as an expert on the ability of the carpet to withstand the traffic to be expected and also in the quality of carpet itself. He testified to an extensive prior experience in the carpet industry. It appears that thereby a satisfactory foundation for his opinion testimony was laid under the requirements of Rule 702 of the Federal Rules of Evidence.

by Mr. High and his employees.[4] The evidence remains uncertain as to the causation of the damage of the tiling and the holes in the ceiling and walls.[5] Some evidence also exists that, in hiring the temporary employees who would aid in the evacuation of the premises, there may have been some ignoring of the background of some of them as it bore upon the likelihood that they would use ordinary care in their operations in evacuating the premises.[5a] But there is no direct evidence which traces causation of any of the damages to this possible absence of care in selection of the employees.

### Conclusions of Law

█ The parties have devoted extensive portions of their briefs to the question of whether the lease is applicable with its provisions for liability of a tenant to the landlord for negligence.[6] The court does not deem this supposedly threshold issue to be a material one. The evidence, as recited above, demonstrates that the trustee, although not affirmatively accepting the lease, nevertheless paid according to its terms and, at least, accepted the status as a tenant. As such, he is liable for damages caused by his negligence as a tenant.[7]

█ Further, the evidence which has been adduced demonstrates some negligence, relatively minor in character, and some damage which may reasonably be attributed thereto. It can be characterized as negligence not to have protected the carpet against the rolling of heavy carts, as were used in the evacuation of the premises, by anything more than heavy brown paper. Certainly, it was contemplated that use of the premises would involve heavy traffic, but it is hardly excusable that some doors were removed and holes in the ceilings and walls inflicted during the tenure of the trustee. The measures to prevent frequent staining of the carpets by coffee and cigarettes should have obviously been taken before such staining commenced, rather than after. This court therefore concludes that some of the damages have been caused by negligence of the trustee's agent, although not to the extent which the claimant has alleged and contended.

The evidence which was presented by the claimant next presents the question of how much in damages should be considered to have been inflicted by the trustee and what measure of damages should be utilized in awarding the damages. The claimant seeks, "alternatively,"[8] either the differ-

---

4. Also, extensive painting was undertaken at one point, according to Mr. High's testimony. This was apparently done at his own expense or that of his employees.

5. It was the testimony of Mr. Poindexter that he made periodic visits to the premises during the time periods before and after the appointment of the trustee, and that this damage took place after the appointment of the trustee.

5a. As is noted below in the text of this memorandum, this has given rise to an allegation made by the claimant in his posttrial briefing that the claimant's property was injured through wilful misconduct which was involved in hiring two "winos".

6. The trustee contends that the lease provisions are not applicable because they were not affirmatively accepted by the trustee and therefore must be deemed rejected.

7. Even if the lease was not governing, see note 6, *supra*, there can be little question that the trustee was a tenant of the claimant. That relationship, without more, imposes the obligation

not to inflict injury upon the premises by negligence. Ordinary wear and tear is acceptable, but to harm the premises by negligence is forbidden under the common law. "(A)n obligation upon a tenant (results) from the relationship of landlord and tenant to refrain from injury to the demised premises by his negligence or willful misconduct; and if, by his negligence or misfeasance, the premises are materially injured, he is liable in damages." *Sparks v. Lead Belt Beer Company,* 337 S.W.2d 44, 45 (Mo.1960). Nor can it be said that the trustee would not be liable for the negligence of the lessee, who must necessarily, under the law of bankruptcy, have worked under the supervision and control of the trustee during the period of administration of the within bankruptcy estate.

8. In his posthearing brief, the claimant states that he "seeks only to recover the diminution in value attributable to the Trustee's wrongful acts (excepting ordinary wear and tear) as established by the testimony of William Poindexter or, alternatively, the cost of repair of those damages to the premises which William Poindexter in his virtually daily visits to the premis-

ence in value wrought by reason of the trustee's negligence—a sum of $100,000 according to his claims—or the cost of repair, a sum which, according to the evidence, is only about one tenth of that figure. Ideally, according to the authorities, difference in value and cost of repairs should be approximately the same, inasmuch as they are conceived of as alternative methods of remedying the same injury to property. "In many instances, the two rules ... will produce the same measure of recovery." 22 Am.Jur.2d *Damages* sec. 132, p. 191 (1965). In particular respect of real estate, in the absence of exceptional circumstances which are not shown to be present in this case, "(t)he diminution in market value of a piece of real estate is often measured by the cost of repairing the injury to an interest therein." *Id.* These principles, in the action at bar, lead the court to conclude that the difference-in-value believed by the claimant to exist must necessarily be regarded as greatly inflated, when it is several times the cost of repair.

■ Further, under the law of the State of Missouri, it is the rule that the measure of damages which produces the lesser value must be employed. "Cases in this state do recognize that where damaged property can be restored to its former condition at a cost less than the diminution in value, the cost of restoration is the proper recovery." *Jack L. Baker Cos. v. Pasley Mfg. and Distrib. Co.,* 413 S.W.2d 268, 273 (Mo. 1967). "[T]he general rule [is] that the measure of damages for tortious injury to real property is the difference in fair market value of the property before and after the injury or the cost of restoring the property, whichever is the lesser amount." *Ca-*

*sada v. Hamby Excavating Company,* 575 S.W.2d 851, 858 (Mo.App.1978). This court therefore concludes that the cost of repairs is the appropriate measure of damages to be employed in this case.

■ It is a more vaguely defined issue as to what figure the court must arrive at in computing those damages. The claimant's evidence, as noted above, would require the imposition of some $10,000 in damages plus those which are attributable to the replacement of the returned power poles and the lost wooden pallets. According to the facts which have been found above, the only certain element of these damages is the $50 cost for the reinstallation of the 14 returned power poles. Thus, an award of $700 is an appropriate figure to compensate the claimant in this regard. Nuances of uncertainty attach to the consideration of the other elements to be awarded. This uncertainty derives not only from the fact that some undefined portion of the damage existed prior to the trustee's taking over the premises, but from sundry other factors as well: the attributability of at least some of the cost of repairs to "ordinary wear and tear" which cannot, under the applicable law, be regarded as the product of negligence;[9] the contemplation by the parties to the lease, as evidenced by its provisions, of some heavy wear and tear in the future;[10] and the fact that, according to the evidence, the premises may well have been sold by the claimant for as much as they would have brought even without the evidenced damages.[11] All of these factors work to reduce the elements of damage remaining to be found.

es observed to have been caused by the June 1981 vacation."

9. Negligence necessarily produces compensable damage, not ordinary wear and tear. Conversely, wear and tear must be excepted from the damage award attributable to negligence. "The effects of negligence are not wear and tear, and they do not become wear and tear merely because they may be anticipated." *Moran Towing Corp. v. M.A. Edmming Const. Co.,* 363 F.2d 108, 114 (1st Cir.1966).

10. The renovations which the claimant was required to make under the terms of the lease recited above are evidence of some expectation of the type of usage and traffic which necessitated periodic repairs and reconstruction.

11. As noted above, Mr. Poindexter's attribution of $150,000 in value to a parking lot is not amply supported by underlying fact. And his estimate of a great degree of diminution in value seems belied by a cost of repairs which is only a fraction of that estimate.

Nevertheless, the two estimates of costs of repair must be regarded as evidence of sufficient character to prevent any finding in this regard from being purely speculative. The court accordingly finds that the reasonable cost of repairs exceeds the $4843 testified to by Mr. Line (a figure which is admittedly under the costs which were applicable as of the date of the hearing) and is less than the $10,000 figure otherwise evidenced. A figure of $5,200 amply covers the cost of repair other than the cost of reinstallation of the power poles. According to the evidence presented, this figure is the one which is correctly attributable to the negligence evidenced and omits the damages due to ordinary wear and tear and that which was already extant when the trustee took over the premises. Accordingly, when the $700 attributable to the cost of reinstalling the power poles is added, the total award is $5,900.00.

▮ Finally, the claimant contends that these damages must be awarded as an expense of administration within the meaning of section 64a(1) of the Bankruptcy Act, as an actual and necessary expense of administration. The trustee, on the other hand, contends that the authority cited by the claimant in support of this proposition is distinguishable as applying only to the operation of a business during reorganization proceedings, not during liquidation proceedings.[12] But the letter of section 64a(1) of the Bankruptcy Act makes no such distinction. It plainly and simply provides for a priority allowance to "the actual and necessary costs and expenses of preserving the estate subsequent to filing the petition." It can hardly be doubted that the activity being carried out in the premises which were damaged as a result—the collection and proper disposition of the freight bills which it was the duty and business of the debtor corporation (and hence the trustee) to collect and properly distribute—was necessary to the process of estate administration and to preservation of the assets of the estate. This court therefore concludes that the $5,900 should be allowed as a priority claim pursuant to section 64a(1) of the Bankruptcy Code.

### The Timing of This Decision

Counsel for the claimant have frequently, since the date of the hearing held on this claim, solicited the court to render its decision. They have done so both orally and in writing. Their contentions in this regard, further, seem to be underlined by the relative simplicity of the legal issues which the court was required to resolve. But the simplicity of these issues is belied by another factor which gave the court great difficulty in rendering its decision. The claim was potentially a large one—at its best from the point of view of the claimant, it was a $100,000 claim—and also contended to be awardable as an expense of administration. And the posthearing briefs of the claimant contend that "only 5–10% of the $100,000.00 diminution in value was the result of ordinary wear and tear"; that it resulted from the "disregard" of the trustee's agents "for the condition of claimant's premises"; that the parties did not "contemplate ... the *wilful disregard* for the premises by TCM employees" (emphasis added); that such "disregard for the safety of the premises" was "evidenced by the hiring of two 'winos' to assist in the June 1981 vacation"; and that "(c)laimant seeks only to recover the diminution in value attributable to the *Trustee's wrongful acts.*" (Emphasis added.) If, however, the damages caused by the trustee or his agents were really caused by the willful and deliberate conduct of the trustee or his agents, then the liability of the trustee might be individual and personal.[13] Of such an action, the bankruptcy

---

**12.** The trustee cites no persuasive authority to support his contention that the claim should not be allowed as an expense of administration. Rather, he attempts to distinguish the authority relied upon by the claimant by noting that it is a reorganization case. But, as the court notes, the broad and clear letter of the statute is sufficient to control this case.

**13.** "(A) trustee in bankruptcy may not be held personally liable unless he acts willfully and deliberately in violation of his fiduciary duties."

court might well not have jurisdiction. Even with implied or express consent of the parties, jurisdiction in bankruptcy ordinarily and traditionally could not extend to actions which will have no effect on the bankruptcy estate.[14]

Nor would concern over this jurisdictional issue be relieved by any holding that the assertions made in the posttrial briefs of the claimant were without any factual basis and were not supported by the evidence which had been adduced. For this would, of course, amount to a ruling on the merits of the claimant's potential claim for damages in this respect, a ruling which could, as noted above, only be based upon an infirm jurisdictional basis. So the fact that these assertions were made, without more, foisted a most troublesome issue on the bankruptcy court.

By the time the briefing schedules had been completed, it was commonly said that the Congress of the United States was on the verge of passing a new jurisdictional statute which might have conceivably obviated the serious jurisdictional problem presented by this matter. But the new jurisdictional statute which was passed on March 29, 1984, and which constitutes the sole source from which the bankruptcy court might lay claim to jurisdiction in both old Act and new Code cases, only compounded the pre-existing jurisdictional uncertainty. As this court has elsewhere analyzed, the statute appears to accomplish only a simple resurrection of the jurisdictional statute which was stricken as unconstitutional in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).[15]

Under such a statute, the bankruptcy court, it appears must somehow be held to be qualified to exercise the jurisdiction of an Article III court or else indulge in the vain exercise of void jurisdiction.[16] The interim emergency rule for bankruptcy administration offers little or no aid in this situation. Under the text of that rule, the bankruptcy court may not refer this case to the district court, either by way of a report and recommendation or otherwise.[17] This is especially so when any power of the

*Sherr v. Winkler*, 552 F.2d 1367, 1375 (10th Cir.1977). But he is liable in his official capacity for negligence and "(t)he rule applies to the trustee's selection and supervision of his agents and employees." *Id.*

**14.** "Thus, consent cannot operate to confer jurisdiction on the bankruptcy court as to a claim asserted by strangers to the proceedings over a matter in no way connected with the administration or distribution of the bankrupt estate." 2 Collier on Bankruptcy para. 23.08, p. 534, n. 7 (1976).

**15.** The statute currently in existence purports to extend the effectiveness of sections 404(a) and (b) of the Bankruptcy Reform Act of 1978 to June 20, 1984. Section 404(b), in turn, provides that, during the period for which it is extended, the currently sitting bankruptcy judges "shall serve in the court of bankruptcy ... *in the manner prescribed by this title.*" (Emphasis added.) That title, Title IV of the Bankruptcy Reform Act of 1978, Pub.L. 95–598, provides at sections 405(a) and (b) that the bankruptcy judges now sitting may exercise the "jurisdiction and powers conferred by," *inter alia*, section 241 of the Bankruptcy Reform Act, the same section which the plurality opinion in *Marathon, supra*, held to be within the competence only of an Article III court.

**16.** "(W)here the invalidity of an act or a portion thereof goes to the power of the legislature to enact the law, and not merely to the form of the enactment, no rights or correlative obligations may arise under such invalid statute." 16 Am.Jur.2d Constitutional Law section 257, p. 728 (1979). In the *Marathon* case, *supra*, the Supreme Court held that it was beyond the *power* of Congress to confer the judicial power of the United States upon non-Article III courts. "We conclude that section 241(a) of the Bankruptcy Act of 1978 has impermissibly removed most, if not all, of 'the essential attributes of the judicial power' from the Article III district court, and has vested those attributes in a non-Article III adjunct. Such a grant of jurisdiction cannot be sustained as an exercise of Congress' *power* to create adjuncts to Art. III courts." (Emphasis added.).

**17.** An ordinary claim, such as this would conceivably be in the view of the district court, is not such a matter as may be referred to the district court under the emergency rule. This would likely be so even though, under the circumstances of this case, the claims of personal liability appear to be inextricably intertwined with the ordinary claim against the estate. Both actions, however, when power to adjudicate them is conferred by statute, involve an exercise of the federal judicial power.

bankruptcy court to make such references, if employed regularly in a matter such as this, would defeat the purpose of the emergency rule—to prevent inundation of the district court with bankruptcy matters. Yet, to keep the case in the bankruptcy court is to exercise the federal judicial power pursuant to Article III of the Constitution. For, when jurisdiction is conferred by statute to determine justiciable matters, the bankruptcy court may no longer avoid exercise of the federal judicial power by electing to exercise the nonstatutory, inherent jurisdiction of a court of equity with a res in its possession.[18]

Further, even though the court has now awaited two additional deadlines for Congressional action—May 1, 1984, and May 26, 1984—, they have only resulted in Congressional repassage of the same statute. Accordingly, it is incumbent upon the court at this juncture, in view of the claimant's persisting demands for action, to find a rational basis for its exercise of the federal judicial power, if possible. In this regard, it is sometimes said that a non-Article III court may exercise the federal judicial power for a transitory period.[19] But, to date,

that doctrine has been held to be applicable only in territories and nascent states where local exigencies are such that territorial courts are the only courts available to exercise the federal judicial power.[20] In all other contexts, the emergency exercise of Article III power by non-Article III courts has not been envisaged [21] and has held any resulting judgment to be subject to reversal on appeal on review initiated *sua sponte* by the reviewing court.[22] The exercise of such power by this court on such a basis would be especially risky in view of the bankruptcy court's not coming within any of the categories of courts which have been permitted temporarily to exercise Article III power on a temporary emergency basis.[23]

Can there be any other basis for this court's exercise of such power? Formerly, the Supreme Court of the United States, in *Glidden Co. v. Zdanok*, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962), held that an Article I court could mature into an Article III court by virtue of Congress' conferring upon it such responsibilities as necessarily engage the federal judicial pow-

---

**18.** Jurisdiction of justiciable matters conferred by congress is, by definition, the federal judicial power. "All federal courts, other than the Supreme Court, derive their jurisdiction wholly from the exercise of the authority to 'ordain and establish' inferior courts, conferred on Congress by Article III, section 1, of the Constitution." *Lockerty v. Phillips*, 319 U.S. 182, 187, 63 S.Ct. 1019, 1022, 87 L.Ed. 1339 (1943). The inherent jurisdiction which this court would be able to exercise in the absence of statute, see, e.g., *Matter of Isis Foods, Inc.*, 26 B.R. 122 (Bkrtcy.W.D. Mo.1983), cannot, for the foregoing reasons, be exercised by a non-Article-III court when its jurisdiction is conferred by statute.

**19.** "Where necessary and justified by an exigency a non-Article III judge may exercise the judicial power of the United States for a transitory period." *In re Johnson County Gas Co., Inc.*, 30 B.R. 690, 701 (Bkrtcy.E.D.Ky.1983).

**20.** "The touchstone of decision in all these cases has been the need to exercise the jurisdiction then and there and for a transitory period. Whether constitutional limitations on the exercise of judicial power have been held inapplicable has depended on the particular *local* setting, the practical necessities, and the possible alter-

natives ... Since the conditions obtaining in one territory have been assumed to exist in each, this Court has in the past entertained a presumption that even those territorial judges who have been extended statutory assurances of life tenure and undiminished compensation have been so favored as a matter of legislative grace and not of constitutional compulsion .... the presumption should be reversed when Congress creates courts the continuing exercise of whose jurisdiction is ... to carry into effect powers ... over subject matter ... and not over localities." *Glidden v. Zdanok*, 370 U.S. 530, 547, 548, 82 S.Ct. 1459, 1471, 1472, 8 L.Ed.2d 671 (1962). See also *Marathon, supra,* 102 S.Ct. at 2870, n. 23.

**21.** See *United States v. Woodley*, 726 F.2d 1328 (9th Cir.1983), in which it was held that an exercise of Article III power by a short-term "vacation" appointment could not withstand the test of the constitutional requirements.

**22.** See note 21, *supra.*

**23.** The decision in the *Marathon* case, *supra,* to the effect that the bankruptcy court is not a legislative court is binding on this issue.

er;[24] that, although the statutory declaration of Congress as to a court's classification could not be ignored, it is the courts themselves who have the power and duty to determine a court's constitutional status;[25] that, even if the judges on a court were not invested with Article III status at the time of their initial investiture, their status matures into Article III status when the court on which they sit becomes an Article III court;[26] and that their reappointment is not a necessary prerequisite to their being accorded Article III status in such a manner, so long as their prior appointment was presidential.[27] The authorities hold with universality that a legislative court which performs only duties which are capable of being performed by an administrative officer as by a judicial officer may, in the discretion of Congress, be denominated either an Article I court or an Article III court.[28] But a court which is assigned duties by statute which are necessarily judicial must be regarded as an Article III court. Can it be said that, under these longstanding principles, Congress' resurrecting section 241 as the bankruptcy court jurisdictional statute in the wake of the *Marathon* decision, *supra,* and, at the same time, making the bankruptcy judges' appointments presidential in character has converted the current interregnum court into an Article III court? That is a determination which cannot be made with any

24. *Glidden Co. v. Zdanok,* 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962). "(W)hether a tribunal is to be recognized as one created under Article III depends basically upon ... whether ... its business is the federal business there specified and its judges and judgments are allowed the independence there expressly or impliedly made requisite." 370 U.S. at 552, 82 S.Ct. at 1474.

25. Courts "may not disregard" the expressed intention of Congress, but "congress may not by fiat overturn the constitutional decisions of the (Supreme Court)." *Glidden v. Zdanok, supra* note 24, at 541, 82 S.Ct. at 1468.

26. Even when not "invested upon confirmation with Article III tenure and compensation," 370 U.S. at 538, 82 S.Ct. at 1466, judges might become so invested, "depending upon the constitutional status of the courts to which they were primarily appointed." 370 U.S. at 541, 82 S.Ct. at 1468.

27. "It is my belief that prior to 1953 the Court of Claims had all of the characteristics of an Article III court—jurisdiction over justiciable matters, issuance of final judgments, judges appointed by the President with consent of the Senate—save as to the congressional reference matters. It was the fact that a substantial portion of its jurisdiction consisted of congressional references that compelled (a former Supreme Court decision) that it was not an Article III court and therefore the salaries of its judges could be reduced. Since that time the Article III jurisdiction of the Court of Claims has been enlarged by including original jurisdiction under several Acts .... The result is that practically all of the court's jurisdiction is now comprised of Article III cases. And I read the 1953 Act as unequivocally expressing Congress' intent that this court—the jurisdiction of which was then almost entirely over Article III cases— should be an Article III court, thereby irrevocably establishing life tenure and irreducible salaries for its judges ... I see nothing in the argument that the 1953 and 1958 Acts so changed the character of these courts as to require new presidential appointments. Congress was merely renouncing its power to terminate the functions or reduce the tenure or salary of the judges of the courts. Much more drastic changes have been made without reappointment ..." *Glidden Co. v. Zdanok,* 370 U.S. 530, 531, 586, 589, 82 S.Ct. 1459, 1463, 1491, 1493, 8 L.Ed.2d 671 (1962) (concurring opinion of Clark, J.)

28. See, e.g., the discussion in 1 Moore's Federal Practice para. 0.4[1] et seq., making it clear that, when a court's duties include the federal judicial power, it is to be an Article III court and exceptions are allowed only in the territories. This authoritative work summarizes the relevant decisions of the Supreme Court as follows: "(1) a court exercising jurisdiction only over cases and controversies within Article III is a constitutional court (a proposition questioned in one of the cases); (2) a court exercising jurisdiction only of cases or controversies that are outside Article III is necessarily a legislative court ...; (3) a court exercising jurisdiction of matters that can be the subject of a case or controversy within Article III, but can be disposed of by executive action, is a legislative or constitutional court at the discretion of Congress ... (4) a court that exercises jurisdiction over cases and controversies within Article III, but also over matters not within Article III is a hybrid court, partaking of both types ..., but (5) in the case of the territorial courts, because of their ephemeral character, they may be created as legislative courts." In further excursis on these doctrines, it is pointed out that a "hybrid" court can be a non-Article-III court only in the territories. *Id.,* para. 0.4[4], p. 79.

assurance of finality by this court and accordingly must await future decision.

It is further to be noted that the interregnum jurisdictional statute may not be applicable to the matter at bar, which arises out of an old Act case. The transition period, during which old Act cases and matters arising in them are to be determined as if the new Code had not come into being, see § 403(a) of P.L. 95–598, has not yet ended. If so, the foregoing observations apply with even greater telling force to the applicable jurisdictional statute under the former Act. For, in the recent decision of *Lindsey v. Ipock,* 732 F.2d 619 (8th Cir.1984), our court of appeals has intimated that *Marathon, supra,* although it has prospective application only, applies to decisions made after its effective date.

Accordingly, until June 5, 1984, the court could find no basis upon which to render its final order on this matter. But, on that date, the court received a letter from counsel for the claimant which appears to forego and drop any claim based on wilful and deliberate conduct.[29] By relieving the court from the possibility of deciding a matter distinctly not within its jurisdiction, this action by counsel for the claimant has made it possible for the court to render its decision and yet remain within the bounds of traditional bankruptcy court jurisdiction.

█ It is recognized that the letter of counsel is not really sufficient, however, to relieve the court of the possibility that simply adjudicating a claim under a statute directly conferring judicial powers upon it constitutes an exercise of the federal judicial power.[30] In this respect, however, the

bankruptcy court may rely upon a very recent decision of our district court in *Matter of Hamilton,* Civil Action No. 83–6070–CV–SJ (W.D.Mo. May 14, 1984), in which it was held that the bankruptcy court has no authority to render advisory opinions. This seems to recognize—if not the constitutional status of the bankruptcy court—at least its authority to render decisions in an exercise of the federal judicial power. For it is only constitutional courts which cannot render advisory opinions. "A federal court that is not subject to the limitations of Article III may, of course, be required to render an advisory opinion." 6A Moore's Federal Practice para. 57.12, p. 57–109, n. 2 (1983). This court therefore concludes that the *Hamilton* decision may provide a basis for the bankruptcy court's current exercise of the federal judicial power.[31]

Accordingly, now that these developments have occurred, the court will enter its final order in this matter. It is accordingly

ORDERED that claimant's claim be, and it is hereby, allowed as a priority expense of administration in the sum of $5,900.00.

---

**29.** Counsel have further stated orally to the undersigned that the claimant desires to pursue no individual or personal liability of the trustee.

**30.** The determination of an ordinary claim against an estate, when jurisdiction to make the determination is directly conferred by statute, appears to involve the federal judicial power.

**31.** In the Hamilton case, the bankruptcy court had responded to a request of a debtor to determine the secured status of a junior lienholder under section 506 of the Bankruptcy Code which permits a determination to be made of the extent to which a creditor is secured and to

which he is unsecured. It was clear that, if the junior lienholder's balance due, when added to that of the senior lienholder, was less than the value of the property, the equity may have been claimed as exempt by the debtor, in whole or in part. But, on the basis of the bankruptcy court's finding that the total balance due exceeded the value of the property, the district court found that the bankruptcy court was without authority to make any finding of the extent to which the junior lienholder was secured and the extent to which it was unsecured.