**In the Matter of Arthur Dee NEWCOMB and Patricia Rae Newcomb, Debtors.**

**SAC RIVER VALLEY BANK, Lamar Trust Company, and Lamar Farmers Exchange, Plaintiffs,**

v.

**Arthur Dee NEWCOMB and Patricia Rae Newcomb, Defendants.**

**Bankruptcy No. 82–02601–SW.**

**Adv. Nos. 82–1817–SW, 82–1938–SW and 82–2004–SW.**

United States Bankruptcy Court, W.D. Missouri, Southwestern Division.

Jan. 4, 1985.

As Amended Oct. 31, 1985.

Samuel Short, Stockton, Mo., Mark Fitzsimmons, Jack Hoke, Springfield, Mo., for Sac River Valley Bank.

Gordon Boyer, Lamar, Mo., Lamar Trust Co., Mark Fitzsimmons, Jack Hoke, Springfield, Mo., for Lamar Trust Co.

Mark Fitzsimmons, Jack Hoke, John Bruffett, Springfield, Mo., for Lamar Farmers Exchange.

George C. Baldridge, Joplin, Mo., for defendants.

## ORDER DENYING DEFENDANTS' MOTION TO ALTER OR AMEND JUDGMENT DENYING THEIR DISCHARGE IN BANKRUPTCY

DENNIS J. STEWART, Bankruptcy Judge.

The former judgment of this court, entered on November 10, 1983, denied the discharge in bankruptcy of the defendants for failure to account for the disposition of a significant amount of their assets. The reasoning which was then employed by this court was as follows:

"the plaintiffs adduced the debtors' financial statements showing, or tending to show, that the debtors actually had a surplus of some $800,000.00 to $900,-000.00 within two years of the date of bankruptcy. In fact, the financial statement which was rendered by Arthur D. Newcomb and Patricia R. Newcomb to the Sac River Valley Bank as late as October 9, 1980, less than two years before the date of bankruptcy, August 12, 1982, purports to show total assets of $1,803,122.57 and liabilities of but $850,-169.22, thus leaving the debtors with a net worth of $952,953.35. There is absolutely nothing in the evidence, on the other hand, which could warrant an inference that the diminution of these assets in the 22 ensuing months has in any manner been explained. As of the date of bankruptcy, the debtors reported assets of $283,505.89. The difference is $669,447.46. In the financial statement which had previously been rendered to the Sac River Valley Bank on May 10, 1979, the debtors' annual expenses were estimated at $101,000.00. At the time, according to the debtors' statements, this was easily payable from an estimated annual income of $294,103.00. According to the evidence, the debtors reported a sizeable loss in 1979, some $38,947.00. Even if it may be assumed that a similar loss was incurred in 1980 (although the adduced and admissible evidence does not warrant such a finding) over $400,-000.00 in assets may still remain unaccounted for. Further subtracting the amount of cattle sold during the two-year period, $167,673.80, leaves over $200,000.00 still unaccounted for. This is too much unaccountability for the court to suffer in determining whether discharge should be denied, particularly when the figure has been arrived at ... by drawing many inferences from the evidence in favor of the debtor and when schedules of liabilities show the existence of liabilities still in the large sum of $824,044.22 without any reports of transfers within the year preceding bankruptcy." [1]

On November 18, 1983, the defendants moved to alter or amend the judgment thus entered. To summarize the contentions which were made by them, they were of two principal species: (1) that the court's figure as to the amount of assets accounted for failed to take into consideration the depreciation which had taken place between October 9, 1980, when the financial statement upon which the prebankruptcy values were based was given to the Sac River Valley Bank and the date of bankruptcy and (2) that, given an opportunity, the debtors could satisfactorily explain the disposition of the other assets. [2] The court rejected the first of these contentions, not-

---

**1.** In arriving at the numerical conclusions which it did in the judgment of November 10, 1983, the court, in accordance with its practice of viewing the accounting in the light most favorable to debtors, demonstrated how even the surplus claimed by the debtors on the October 9, 1980, financial statement had not been adequately accounted for. But, in order to be granted a discharge in bankruptcy, of course, the debtors needed not only to account for the disposition of this surplus, but the entire range of assets.

**2.** As the court has pointed out in its previous orders in this action, however, the debtors make no showing in connection with their motion for reconsideration or to alter or amend judgment that any of the evidence which would demonstrate the disposition of assets or reduction in value is newly-discovered evidence which could not have been discovered in the utilization of due diligence in time for the trial of this action.

ing that no evidence of depreciation had been adduced in the hearing on the within objections to discharge, although an ample and explicit opportunity to do so had been granted.[3] The court, in order to ensure that the second contention was not based on facts which were arguably of record in the hearing which had been held, permitted the defendants to make written offers of proof in this regard. The offers of proof which were then successively made by the defendants resulted in the following accounting for the assets allegedly possessed as of October 9, 1980:

| description of asset | value listed on October 9, 1980 | value in bankruptcy schedules | other (see number of footnote indicated.) |
|---|---|---|---|
| 1032 Clinton | $16,500.00 | $9,000.00 | |
| 506 East 3rd | 11,500.00 | 4,500.00 | |
| 609 Fulton | 12,000.00 | 7,000.00 | |
| 400 & 404 Fulton | 55,000.00 | | 4 |
| 508 Walnut | 165,000.00 | | 5 |
| 502 West Macon | 40,000.00 | | 6 |
| 1019 Clinton | 15,000.00 | 14,000.00 | |
| 911 Grant | 26,500.00 | 4,000.00 | |
| Kendricktown | 35,000.00 | 15,000.00 | |
| 1003 Grant | 26,000.00 | 9,000.00 | |
| 503 Fulton ) | 27,750.00 ) | | |
| 309 Ornder ) | 30,000.00 ) | 30,000.00 | |
| 809 Grant ) | 25,000.00 ) | | |
| 706 Grant | 26,000.00 | | 7 |
| 722 Grant | 17,000.00 | | 8 |
| 514 & 518 E. 4th | 60,000.00 | | 9 |
| 613 Fulton | 18,000.00 | 6,000.00 | |
| 621 E. 5th | 11,000.00 | 5,000.00 | |
| 1019 Garrison | 37,500.00 | 18,000.00 | |
| 411 Orchard | 12,000.00 | 5,000.00 | |
| 901 Case | 20,000.00 | | 10 |
| 109 E. 10th | 22,000.00 | 6,000.00 | |
| 705 E. 3rd | 50,000.00 | | 11 |
| 1015 Garrison | 18,000.00 | 8,000.00 | |
| 1011 Garrison | 12,000.00 | | 12 |
| 801 Case | 15,000.00 | | 13 |
| 10th and Lyon | 50,000.00 | | 14 |
| 210 Lincoln | 30,000.00 | | 15 |
| 718 Sycamore | 10,000.00 | | 16 |
| 701 Poplar | 12,000.00 | 2,000.00 | |
| Carthage Farm | 135,000.00 | | 17 |
| Lamar residence | 125,000.00 | 60,000.00 | |

3. As the court has pointed out in its prior orders, the financial statement of October 9, 1980, was offered and admitted in evidence at the trial of this action in support of an allegation made in one complaint of failure to explain satisfactorily the diminution of assets to meet liabilities.

4. No accounting was made for this property either in the schedules or in the hearing conducted on the objection to discharge. In a post-judgment submission to the court on November 18, 1983, it was said by the debtors' counsel that this "property (was) sold on assumption to Barney P. (now deceased) and Gallie D. Eagen. Property claimed by trustee. Mrs. Eagan has signed property back to trustee."

5. In the submission of November 18, 1983, it was said by debtors that "this property was traded to George Royer for other property." The "other property" is not denied and it is not

The properties which remained wholly unaccounted for as a result of these offers are those which are alleged to have been transferred to others prior to the date of bankruptcy.[18] But no showing has been made that these transfers were for value, although ample opportunity has been accorded for such a showing, or that the proceeds should not be turned over to the bankruptcy court.[19] The combined value of

suggested that it has been made a part of the bankruptcy estate.

**6.** In the postjudgment submission of November 18, 1983, it was said by the debtor's counsel that the property was sold on assumption to Barney P. (now deceased) and Gallie D. Eagan; that the property was claimed by the trustee; and that "Mrs. Eagan has signed property back to trustee."

**7.** See note 6, *supra*. The same postjudgment contentions are made respecting this property.

**8.** In the postjudgment submission of November 18, 1983, it is said that this "property (was) turned back to mortgageholder—Glen Freeman." The date of the return is not stated, nor are any of the other circumstances of the return stated in the postjudgment submission.

**9.** In the postjudgment submission of November 18, 1983, it is simply stated that this property "(was) omitted (from the) Bankruptcy Schedules."

**10.** See note 6, *supra*. The same postjudgment contentions are made respecting this property.

**11.** See note 6, *supra*. The same postjudgment contentions are made respecting this property.

**12.** In the postjudgment submission of November 18, 1983, it is said that this property was "traded in on Larry Ross property. Value per statement, $12,000 less mortgage $7,000, difference $5,000."

**13.** In the postjudgment submission of November 18, 1983, it is said that this property was "not listed on schedules (but was) sold by trustee."

**14.** In the postjudgment submission of November 18, 1983, it is said that this property was "sold to Mormon Church for amount of loan."

**15.** See note 6, *supra*. The same postjudgment contentions are made respecting this property.

**16.** See note 6, *supra*. The same postjudgment contentions are made respecting this property.

**17.** In the postjudgment submission of November 18, 1983, it is said that this property was "sold 8–18–81 to Hacienda Farms, Inc.—net received $21,619.00."

**18.** See notes 5, 8, 9, 12, and 17, *supra*. The property which is not accounted for by the brief entries in the postjudgment submissions has a value totaling $389,000, according to the values placed thereon in the financial statement of October 9, 1980. In respect of two of the properties, it is said that there was nothing remaining after they were either sold for assumption of the mortgage or else that there was nothing left after they were returned to the mortgageholder. See notes 5 and 14, *supra*. But insufficient facts are stated respecting those sales or trades to permit the court to determine whether such sales or returns were for equivalent value. With respect to other returns or sales for greatly reduced value, see notes 8, 12, and 17, the same principle applies—not enough information is given from which it can be determined whether the exchanges or sales were for equivalent value —and, if so, whether the proceeds were gained sufficiently close in time to the filing of the bankruptcy proceedings to require their turnover to the bankruptcy.

**19.** If the transfers were shown by the facts to be voidable under sections 544, 547 or 548 of the Bankruptcy Code, then the property or its value may be recovered by the estate. See section 550(a) of the Bankruptcy Code. But, even if the transfer is not avoidable for non-equivalence of the value for which it was transferred, the proceeds should be turned over to the estate as property of the estate if they are still in existence as of the date of bankruptcy. See sections 541, 542 of the Bankruptcy Code. But the debtors have not advised the court of sufficient facts to permit these determinations to be made. "(T)he bankrupt must explain his losses or deficiencies in such manner as to convince the court of good faith and businesslike conduct ... Even though the underlying facts referred to by a bankrupt may suggest a plausible explanation, the testimony may be so general as to be insufficient. More is required of the bankrupt in the way of explanation than mere generalities." 1A Collier on Bankruptcy para. 14.60, pp. 1436, 1437, 1438 (1978).

these disposed-of properties and the other failures of explanation are simply too great to permit the court to enter a discharge in bankruptcy in this case.[20] And this is so even if the court should hold that the vast depreciation of the properties during the time period from October 9, 1980, to August 12, 1982, has been adequately accounted for. Under the relevant provisions of section 727 of the Bankruptcy Code, it remains the duty and obligation of the debtors timely to disclose the nature of their transfers, and the relevant facts concerning them, so that proper estate administration can take place.[21] And further, absent some admissible proof, the court cannot assume that the great losses in values of property were not due to causes other than depreciation—to removal of improvements or parts thereof, for instance, or to initial falsification of the values in the financial statement which was submitted to the Sac River Valley Bank.

Accordingly, after a thorough review of the initial record of the hearing and the posthearing offers of proof which have been made by the debtors, it is concluded that the debtors have not adequately explained the diminution of assets and that the motion to alter or amend the judgment of November 10, 1983, should be denied.[22]

## II

At the time this court initially entered its judgment denying the debtors' discharges in bankruptcy, the jurisdictional strictures which were later imposed on bankruptcy court jurisdiction did not obtain in this case. Although the Supreme Court of the United States had rendered its opinion in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), striking the bankruptcy court jurisdictional statute on the grounds that it called for exercise of the federal judicial power by non-Article-III judges, the federal judicial power was not then engaged by the exercise of nonstatutory, inherent jurisdiction of the bankruptcy court. See, e.g., *Matter of Brown*, 26 B.R. 119, 120 (Bkrtcy.W.D.Mo.1983) ("The jurisdiction of the bankruptcy court to determine the dischargeability of claims, however, is not dependent on statute. Matters of administration and distribution of a bankruptcy estate are within the inherent jurisdiction of a court of bankruptcy.... It is inextricable from such inherent jurisdiction that the court of bankruptcy determine the amount of each claim, if any, to be discharged by distribution of the assets in its possession."). This was so because the federal judicial power is necessarily and by definition a creature of statute.

By the time the matter of the motion to alter or amend judgment had been submitted to the court for decision,[23] however, bankruptcy court jurisdiction again was made the subject of statute. See *Matter of Lenz*, 39 B.R. 444, 445 (Bkrtcy.W.D.Mo. 1984). It is true that, by this time, the "effective holding" of the *Marathon* decision, *supra*, had been narrowed by the federal appellate and district courts to the rule that "certain private *state* law claims,

---

**20.** As noted above, see note 18, *supra*, the value which is not sufficiently accounted for approximates $400,000. And to approach this figure, the court does not need to take into account the equally insufficient explanations which are made for the dispositions of the properties sold on contracts for deed and the payments therefor.

**21.** See note 19, *supra*.

**22.** As noted above, on simple inadequacy of explanation respecting the dispositions of real property, the failure to explain approximates $400,000 in value. See note 20, *supra*. The failure to demonstrate depreciation, see note 3, *supra*, (and thereby dispel any notion that the properties had been reduced in value by actual conversion or appropriation or destruction or waste of the premises) would render the figure much higher.

**23.** The last postjudgment submission was filed by the debtors on March 5, 1984. Counsel for the debtors orally requested that the court wait additional time in order to grant him the opportunity to make a further submission. On March 31, 1984, the interim law keeping the bankruptcy court in service expired and an act of Congress resurrected section 404 of P.L. 95–598, thus creating the jurisdictional problems described in *Matter of Lenz*, 39 B.R. 444 (Bkrtcy. W.D.Mo.1944).

when adjudicated within the federal system, must be decided by Article III courts." *Kalaris v. Donovan*, 697 F.2d 376, 386 (D.C.Cir.1983) (Emphasis in original.).[24] The action at bar, however, although it arises under section 727 of the Bankruptcy Code, may also be considered as one arising under state law—as an action for accounting brought by creditors in which, under state law, it would be possible to obtain very nearly the same form of relief as is available to creditors under section 727, *supra*.[25] The letter of the *Marathon* decision, *supra*, does not except from its rule actions which can be said simultaneously to arise under state law and federal bankruptcy law.[26] Nor does any of its progeny. Indeed, "the plurality opinion ... would have gone further than the Court's effective holding." *Kalaris v. Donovan*, *supra*, at 386.[27] And, according to the reasoning of the plurality opinion, the adsorption of state law actions into federal law and the utilization of a sub-Article III court to determine those actions would be a prohibited means of undermining the protections of Article III.[28]

This very real problem, moreover, was soon compounded, as of June 28, 1984, by an even more immediate one of the legality of the tenure of the sitting bankruptcy judges. According to the contentions of such estimable and influential governmental bodies as the Judicial Conference of the United States, the Administrative Office of United States Courts, and the Department of Justice, the tenure of the currently sitting bankruptcy judges lapsed as of midnight on June 27, 1984, and the reinstatement of the sitting bankruptcy judges purporting to have been retroactively effected on July 10, 1984, by the Bankruptcy Amendments and Federal Judgeship Act of 1984, is wholly unconstitutional.[29] It was

24. It is acknowledged that the plurality opinion in the *Marathon* case would go further and hold that adjudications of private rights, as opposed to public rights, constitute exercise of the federal judicial power under Article III of the Constitution.

25. The gist of the claims for relief at bar is the recovery of the property of the debtor to answer for the indebtednesses to the plaintiff and the granting of judgments for any deficiency. This could be more completely accomplished under the state law, perhaps, than in the bankruptcy court. An accounting such as is sought in the action at bar, moreover, can be obtained under state law on the grounds that property which would have otherwise been subject to the creditors' claims was wrongfully transferred. "Equity will, under proper circumstances, impose a constructive trust upon property over which someone has wrongfully assumed control or which has been wrongfully disposed of and such person or he who has possession thereof becomes a trustee ex maleficio." *Coffey v. Coffey*, 485 S.W.2d 167, 174 (Mo.App.1972). A "fraudulent transferee is a mere trustee for creditors to the extent of the effects transferred to him." *Joseph Nelke & Co. v. Boldridge*, 43 Mo.App. 333 (1891). An accounting may be sought where the defendant has a fiduciary duty, e.g., that of a trustee, to the plaintiffs. Further, "(e)quity has jurisdiction to compel an accounting where fraud is charged." 1 Am. Jur.2d sec. 55, p. 428 (2d ed. 1962). And, "(t)he relief given in an action for an accounting is an accounting and a judgment for the balance found due on taking the accounting." *Welt-*

*scheff v. Medical Center of Independence*, 604 S.W.2d 796, 801 (Mo.App.1980).

26. See note 24, *supra*.

27. See note 24, *supra*.

28. "Appellants' contention, in essence, is that pursuant to any of its Art. I powers, Congress may create courts free of Art. III's requirements whenever it finds that course expedient. This contention has been rejected in previous cases.... The flaw in appellants' analysis is that it provides no limiting principle. It thus threatens to supplant completely our system of adjudication in independent Art. III tribunals and replace it with a system of 'specialized' legislative courts." 102 S.Ct. at 2872.

29. See the letter of William E. Foley, Director of the Administrative Office of United States Courts, to Senator Strom Thurmond, Chairman of the Committee on the Judiciary, dated July 11, 1984, to the following effect: "In its efforts to address the jurisdictional problem arising in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), Congress consistently provided for a brief transitional period during which bankruptcy judges would continue to serve until appointments to a new system could be made. However, the terms of office of all bankruptcy judges expired—by operation of law—at midnight June 27. Section 121 of the new law attempts to correct the situation by retroactively extending the terms of these individuals. Since

further suggested by at least some of the protagonists of this contention that any action undertaken by a sitting bankruptcy judge would be void *ab initio*.[30]

In cases and actions such as that at bar, which involve high stakes, the court had consequently been given great pause. The jurisdictional issue alone, under standard authorities, could conceivably result in the issuance of·a judgment by the bankruptcy court which was wholly void and of no effect.[31] And when the jurisdictional infirmity existed in tandem with the assertion of absence of power of the sitting bankruptcy judges, the problem was compounded, giving forth the prospect of the issuance of a void judgment which might give rise only to a series of successive litigations challenging the power and jurisdiction of the bankruptcy court.

Very recently, however, three district courts have held the current tenure of the bankruptcy judges to be lawful and constitutional. See, e.g., *In re Wasatch Factoring, Inc.*, 12 B.C.D. A1 (D.Utah Nov. 29, 1984); *In re Benny*, 44 B.R. 581, 12 B.C.D. 495 (N.D.Cal.1984); and *In re Tom Carter Enterprises, Inc.*, 44 B.R. 605, 12 B.C.D. 536 (C.D.Cal.1984). It has not yet been reported whether appeals have been taken from those orders and judgments, but it appears that this court may now, with some minimal assurance, at least, of its own power to enter these judgments, proceed with them.

The issue of bankruptcy court jurisdiction may be an uncertainty for some time to come. The Bankruptcy Amendments and Federal Judgeship Act of 1984, which applies to this action,[32] grants the bankruptcy court jurisdiction over "objections to

discharges." See section 157(b)(2)(J), Title 28, United States Code. Hopefully, this legislative action dispels any preexisting doubt respecting bankruptcy court jurisdiction in a case such as that at bar. For the same Bankruptcy Amendments and Federal Judgeship Act appears to obviate any objections that judgments may be entered by a non-Article-III court by identifying and subsuming the bankruptcy court into the Article III district court. Thus, it may be said, without exaggeration, that, under the Bankruptcy Amendments and Federal Judgeship Act of 1984, the bankruptcy court is intended to be an Article III court, participating in the grant of federal judicial power to the Article III district court. Under the provisions of section 151, Title 28, United States Code, bankruptcy judges are made "judicial officer(s) of the district court."

The extent to which this identification of the district and bankruptcy courts may suffice to dispel any objection based on the conferring of the federal judicial power is perhaps problematical. Whether the current Act passes the constitutional test set forth in *Marathon, supra*, may depend upon whether that decision is given a narrow or a wide interpretation in the future.[33]

But it nevertheless seems to affront a basic principle of fairness to require parties who would otherwise be entitled to trial and determination in a court of general jurisdiction to be limited to trial and determination before judges who, because of legislative limitations placed upon their competence, could not be considered qualified to conduct the trial and make the determination under the general law. For the reasons stated above, this consideration

---

these individuals were not in office on the date of enactment, section 121 may easily be viewed as an attempt by Congress to make appointments to bankruptcy judgeships—a power Congress clearly does not have under the appointments clause of the Constitution."

**30.** See *op. cit.* note 29, *supra*, to the following effect: "Only a court decision can finally resolve whether section 121 is or is not constitutional. Absent remedial legislation bankruptcy litigants will face grave uncertainty as to the authority of

any bankruptcy judge purporting to act under section 121 until a final court decision is handed down."

**31.** See *Matter of Transport Clearings-Midwest, Inc.*, 41 B.R. 528, 536, n. 16 (Bkrtcy.W.D.Mo. 1984), and authorities there cited.

**32.** See section 115(a) of P.L. 98–353, July 10, 1984.

**33.** Cf. note 24, *supra*.

has been a very troubling and sensitive one for this court in this particular case. And it is only partially driven away by the effect of the new bankruptcy laws which appear to incorporate the bankruptcy court, as observed above, into the federal district court. This court has additionally noted on prior occasion that some of the decisions of the district court have indicated that the bankruptcy court has at least some of the federal judicial power and bears some of the attributes of a constitutional court. See, e.g., *Matter of Transport Clearings-Midwest, Inc.*, 41 B.R. 528, 539 (Bkrtcy.W.D.Mo.1984), to the following effect:

"(T)he bankruptcy court may rely upon a very recent decision of our district court in *Matter of Hamilton*, Civil Action No. 83–6070–CV–SJ (W.D.Mo. May 14, 1984), in which it was held that the bankruptcy court has no authority to render advisory opinions. This seems to recognize—if not the constitutional status of the bankruptcy court—at least its authority to render decisions in an exercise of the federal judicial power. For it is only

constitutional courts which cannot render advisory opinions. 'A federal court that is not subject to the limitations of Article III may, of course, be required to render an advisory opinion.' 6A Moore's Federal Practice para. 57.12, p. 57–109, n. 2 (1983). This court therefore concludes that the *Hamilton* decision may provide a basis for the bankruptcy court's current exercise of the federal judicial power."

Reliance upon such a jurisdictional principle appears to run headlong into the principle that "Congress, in establishing inferior courts and prescribing their jurisdiction, must confer on the judges appointed to administer them the constitutional tenure during good behavior before they can become invested with *any portion* of the judicial power of the government." 46 Am. Jur.2d *Judges* sec. 14 (1969). But the recondite character of the problem is perhaps reflected in the possibility that that imperious maxim may operate to support bankruptcy court jurisdiction of this case rather than to destroy it.[34]

---

**34.** See, e.g., *Kalaris v. Donovan*, 697 F.2d 376, 385 (D.C.Cir.1983), to the following effect: "the District Court employed the wrong test for determining whether Congress has created an Article III court. While Justice Harlan did once suggest that the only way to tell an Article I court from an Article III court is to examine the 'establishing legislation (to see if it) complies with the limitations of (Article III)'—and this does come 'dangerously close to saying that Article III courts are those with Article III judges,'—*all* of the opinions filed in the Court's latest Article III case, *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 . . . (1982), agree that it is not what Congress *says* but what powers Congress vests in the adjudicatory body that counts." (Emphasis in original.) "(W)hether a tribunal is to be recognized as one created under Article III depends basically upon . . . whether . . . its business is the federal business there specified and its judges and judgments are allowed the independence there expressly or impliedly made requisite." *Glidden Co. v. Zdanok*, 370 U.S. 530, 552, 82 S.Ct. 1459, 1474, 8 L.Ed.2d 671 (1962). Even when not "invested upon confirmation with Article III tenure and compensation," 370 U.S. at 538, 82 S.Ct. at 1466, judges might become so invested, "depending upon the constitutional status of the courts to which they were primarily appointed." *Id.* at 541, 82 S.Ct. at 1468. At least one of the recent

decisions upholding the current tenure of bankruptcy judges does so, in part, on the basis that section 404(b) of P.L. 95–598 granted sitting bankruptcy judges tenure until March 31, 1984, or until their successors are appointed. *In re Tom Carter Enterprises, Inc.*, 44 B.R. 605, 12 B.C.D. 536 (C.D.Cal.1984). If so, a definite foreshortening of that tenure, such as purports to have been accomplished by the current statute, may offend the rule of *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), to the effect that a public employee with a reasonable expectancy of continued employment has a property right which may not be terminated without due process of law. It is to be noted in this regard, perhaps, that all the decisions which permit the shortening of a legislatively-created judicial tenure appear to be much older than the rule of *Perry v. Sindermann, supra.* If that decision applies, even if the statute granting tenure until a successor is appointed can be regarded as ambiguous, the property right may still attach, for it may still provide a basis for a reasonable expectation of continued employment. Terminating public employment does not deprive one of property "unless the state earlier conferred upon him a right of continued employment by telling him, in a manner that made it reasonable for the employee to expect the state (or federal government) to stand behind its word that it would continue to employ him." *Smith v. Bd. of Educ. of Urbana Sch.*

284

Accordingly, it is hereby, for the foregoing reasons,

ORDERED that the defendants' motion to alter or amend judgment denying their discharges in bankruptcy, or to reconsider it, be, and it is hereby, denied.

*Dist. No. 116,* 708 F.2d 258, 261 (7th Cir.1983). Thus, until a successor is appointed, the sitting judge may be removable only for the reasons stated in the removal statutes. See section 34 of the Bankruptcy Act. If the reasonable expectancy of continued employment is a property right, then the legislature cannot take away that right by reason of retrospective legislation as to rights which were in existence before the legislation was passed. *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed.

1593 (1935); cf. *United States v. Security Industrial Bank,* 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982). And, according to the letter of section 120 of P.L. 98–353, July 10, 1984, considerations as to the appointment of a successor to the current judges cannot commence until there is a "vacancy" in the office. Is there a "vacancy" within the meaning of this section when a judge has a recognized property right to sit until his successor is actually appointed?