In the Matter of PHILLIPS HOUSE ASSOCIATES, INC., Debtor.

Mendel SMALL, trustee in bankruptcy, Plaintiff,

v.

ELLIOTT-OTTINGER CONSTRUCTION CO., James K. Lynch Design Associates, Inc., Boatmen's Bank & Trust Company, Defendants.

Bankruptcy No. 82–01963–1–3–11.

Adv. A. No. 85–0252–1–3–11.

United States Bankruptcy Court, W.D. Missouri, W.D.

Sept. 4, 1986.

---

William T. Session, Linde, Thomson, Fairchild, Langworthy, Kohn & Van Dyke, P.C., Kansas City, Mo., for Boatmen's.

Mendel Small, Scott Goldstein, Spencer, Sane, Britt & Browne, Kansas City, Mo., for trustee.

Ronald S. Weiss, Kansas City, Mo., for Elliott-Ottinger.

William M. Modrcin, Edward E. Frizell, Morris, Larson, King, Stamper & Bold, P.C., Kansas City, Mo., for James K. Lynch Design.

AMENDED FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL DECREE AND JUDGMENT DETERMINING ELLIOTT–OTTINGER CO., AND JAMES K. LYNCH DESIGN ASSOCIATES, INC. TO HAVE PRIOR LIEN INTEREST IN PROPERTY OVER BOATMEN'S BANK AND TRUST COMPANY

DENNIS J. STEWART, Chief Judge.

This is another action in which it has become incumbent upon the bankruptcy court, pursuant to the narrow jurisdictional strictures imposed upon it by the Bankruptcy Amendments and Federal Judgeship Act of 1984, nevertheless to make a determination in a "noncore" action because of that determination's being necessary to the administration of the bankruptcy estate.[1] In

1. See and compare *Matter of Burstein-Applebee, Inc.,* Adversary Action No. 85–0052–3 (Bkrtcy. W.D.Mo. May 15, 1986), in which it became necessary for the bankruptcy court to issue an

**914**

this controversy, two entities—the debtor's principal lender and mortgageholder and a mechanics' and materialmen's lien claimant—both claim a priority security interest in the hotel building which constitutes the debtor's principal asset. There can be no question, according to the evidence and the contentions of the parties, that this controversy between two strangers to the estate (in the sense that neither of the lien claimants is the trustee or the debtor [2]) over property which is not property of the estate (the value of the property equal to the cumulative balance due the two claimants is not property of the estate under the prior holdings of our district court [3]) is of a type as to which a bankruptcy court, under traditional principles, has never had jurisdiction. [4]

### The Issue of Jurisdiction

■ Faced with these general principles which would ordinarily oust this court of jurisdiction, the defendants Elliott–Ottinger Construction Company and James K. Lynch Design Associates, Inc., first advert to case decisions supplied by the trustee in bankruptcy to the effect that the determination of priority in estate property is a "core" matter within the meaning of Section 157(b)(2)(A), (O), Title 28, United States Code. [5]

But those decisions involve at least two crucial points of distinction from the facts at bar. First, as observed above, the property which is an issue in this action is not property of the estate. The determination as to the priority between two lienholders, neither of whose security interests is chal-

injunction against state court litigation brought against a creditor's committee because the injunctive relief, which was necessary to prevent embarrassment to the administration of the estate, if granted by the district court, would have violated the federal Anti-Injunction statute.

**2.** Although the trustee has initiated this case as a party to this action, it appears that he is in no sense a necessary party, or a party needed for a just adjudication, or in any way even a party of interest. It does not appear that the estate's rights, which are admittedly inferior to those of all the defendants, can in any way be affected by the judgment in this action—except that, as the trustee himself contends, he needs to have the adjudication made in order to make the hotel property saleable or, in the event he decides to propose a plan of reorganization, to know the priority according to which payment must be made.

**3.** See *Matter of Hamilton,* Civil Action No. 83–6070–CV–SJ (W.D.Mo. May 14, 1984), which has been analyzed in *Matter of Transport Clearings-Midwest, Inc.,* 41 B.R. 528, 539, n. 31 (Bkrtcy.W. D.Mo.1984).

**4.** Even in the heyday of bankruptcy court jurisdiction under former Section 1471(b), (c), Title 28, United States Code, the bankruptcy court did not have jurisdiction over an action between strangers to the estate which has no effect on estate property. See *In re Systems Marketing Consolidated, Ltd.,* 19 B.R. 519, 8 B.C.D. 1335, 1336 (Bkrtcy.N.D.Ill.1982).

**5.** As a basis for jurisdiction in this case, the trustee relies in part on the decision in *In re Denalco Corp.,* 57 B.R. 392 (N.D.Ill.1986). In

that case, the court held that the bankruptcy court had no jurisdiction in a dispute between strangers over property in which the bankruptcy estate had no interest. The trustee relies on dicta in that case to the effect that "[b]ecause Denalco was in possession of the Mazak when the Chapter 11 proceeding was filed, the bankruptcy court may well have had jurisdiction when Bank initially brought this adversary proceeding. But when the case became a straight Chapter 7 liquidation proceeding, the debtor no longer had any need to *use* the Mazak." 57 B.R. at 396. (Emphasis in original.) But that case also holds that, as a rule, jurisdiction of the bankruptcy court is not existent over a "dispute [which] does not involve the debtor or its trustee as a party, and its outcome cannot affect either the assets or the liabilities of the debtor's estate." *Id.* at 395. The trustee also relies on *Matter of SCK Corp.,* 54 B.R. 165, 168 (Bkrtcy.D. N.J.1984), in which the bankruptcy court held that it had jurisdiction to determine ownership of the debtor itself. But that case cannot purport to be an effective precedent for the proposition that the bankruptcy court may determine ownership of property which is admittedly outside the estate. This is especially so when the basis for extending the decision to that effect— the statement that "[a] matter concerning the administration of the debtors estate is a core proceeding. Section 157(b)(2)(A)," 54 B.R. at 169, is contradicted by a governing appellate court decision, *In re Castlerock Properties,* 781 F.2d 159, 162 (9th Cir.1986). The decision otherwise relied on by the trustee, *In re Atlas Fire Apparatus, Inc.,* 56 B.R. 927, 13 B.C.D. 1304 (Bkrtcy.E.D.N.C.1986), is a lien avoidance action brought by a debtor and thus is inapplicable to this case.

lenged by the trustee, will not add to or detract from the estate one iota insofar as value of property is concerned.[6] Second, the trustee's hypothetical lien is admittedly inferior to both of those claimed and he is accordingly not a party to the action for determining the priority of liens.[7] In the decisions relied upon to insist that there is bankruptcy court "core" jurisdiction in this action, the debtor, or insiders to the debtor, or the trustee have been actual parties in interest.[8] The contention that this is a regular "core" proceeding within the meaning of Section 157(b)(2), *supra*, must be rejected.

The defendants Elliott-Ottinger Construction Company and James K. Lynch Design Associates, Inc., argue, however, and in this respect they are joined by the trustee in bankruptcy, that a determination of this issue is absolutely "necessary" to the successful administration of this chapter 11 estate. The showing of such necessity as may constitute a predicate for bankruptcy court jurisdiction is sought to be made on the basis of testimony of the trustee adduced in a hearing held in this court on March 31, 1986, in which he stated that it would not be possible for him to sell the building—if he determined that its liquidation would be in the best interest of creditors—unless he could tell the prospective purchasers which of the liens has pri-

ority; that, otherwise, prospective purchasers could only look forward to such potential litigation of their own as might be necessary to clear up the question[9]; and that, if he were to embark upon a course of reorganization, it would be essential to the formulation of a plan of reorganization that the priority between the competing lien claimants have been established.[10]

■■■ The relevant decisions recognize that a reorganization court may make the determination of a controversy between strangers to the estate over nonestate property if estate administration would be "impossible" without that determination.[11] According to the contention of the defendant Lynch and the trustee in bankruptcy, administration would in fact be "impossible" without the priority determination which is requested in this action. The property would not be marketable without the priority determination[12] nor could an intelligible plan of reorganization be formulated, filed, or confirmed without this determination.[13] The absence of the determination could only mean the prejudicial delay to the rights of creditors which, under the governing statutes, would require denial of any plan of reorganization and possible dismissal or conversion of this chapter 11 case.[14] This

---

6. See note 3, *supra*.

7. See note 3, *supra*.

8. See note 5, *supra*.

9. See note 2, *supra*.

10. See note 2, *supra*.

11. See *Matter of Burstein-Applebee, Inc.*, 63 B.R. 1011 (Bkrtcy.W.D.Mo.1986), to the following effect: "A bankruptcy court may exercise its jurisdiction to resolve actions otherwise outside its jurisdiction 'if it is impossible to administer completely the estate of the bankrupt without determining the controversy.' *First State Bank and Trust Company v. Sand Springs State Bank*, 528 F.2d 350, 353 (10th Cir.1976). 'Even if resolution of the controversy might have [avoided] a "chilling effect" on the financing of the arrangement plan ... or might reduce claims against the debtor's estate ..., exercising jurisdiction over a collateral controversy is improper where it is "possible" to administer the estate

without resolving the controversy.' *Matter of Paso Del Norte Oil Company*, 755 F.2d 421, 425 (5th Cir.1985)."

12. This is a claim of the trustee and his testimonial contention in this regard has not been contradicted. And it seems reasonable that, if a potential purchaser foresees having to file litigation in order to determine who he should pay, he may be hesitant to go ahead with the purchase. A state court interpleader action could be cheaply bought if he wanted to have the claim made without cost to himself. This, however, may be difficult to explain to potential purchasers.

13. See note 2, *supra*.

14. As it stands now, the trustee has protracted the preconfirmation period for what would seem—without the coexisting pendency of this adversary action—to have been unreasonably long time.

court may therefore assume jurisdiction of the priority question under the rubric of "necessity" or "impossibility of administration" and may—in fact, must—make the determination of that question.

The defendant Boatmen's Bank and Trust Company insists, however, that this court may not make the determination—that, at most, jurisdiction can be exercised only as to a "related" proceeding, as to which the bankruptcy court under Section 157(b)(3) and 157(c)(1), Title 28, United States Code, may only hear the action and make recommended findings of fact and conclusions of law to the district court.[15] But, if that is done in this action, in which it is undisputed that a state court action exists in which the same issues can be litigated[16], the district court would be required, under the provisions of Section 1334(c)(2), Title 28, United States Code, to abstain from determining the litigation in favor of the state court's doing so.[17] And any doubt in the district court's duty to abstain is likely to be resolved by use of the permissive abstention statute, Section 1334(c)(1), Title 28, United States Code.[18]

This is especially so when a decision to abstain under Section 1334(c)(2), *supra*, is unreviewable, while one declining to abstain is seemingly reviewable.[19]

Therefore, it would seem productive of only further delay for this court not to reach the merits of the issues which have been presented to it. This delay, according to the testimony and written contentions of the trustee, cannot be brooked if administration of the within chapter 11 estate is to be successful.

Even if it is to be considered that the mandatory abstention provisions of Section 1334(c)(2), *supra*, do not apply to this adversary action because the underlying bankruptcy case was filed prior to its effective date of July 10, 1984, the district court would also, under the preexisting jurisdictional principles, have had to relinquish jurisdiction of the action at bar.[20] For, under the jurisdictional statute then governing the compass of district court jurisdiction, the district court could not have exercised jurisdiction of the action at bar. Even under the provisions of former Section 1471, Title 28, United States Code, a statute

**15.** See Sections 157(b)(3) and 157(c)(1), Title 28, United States Code.

**16.** See *Elliott-Ottinger Construction Co., v. Boatmen's Bank & Trust Co. of Kansas City*, No. CV83–16816, now pending in the Circuit Court of Jackson County, Missouri.

**17.** That subsection provides as follows: "Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction. Any decision to abstain made under this subsection is not reviewable by appeal or otherwise. This subsection shall not be construed to limit the applicability of the stay provided for by section 362 of title 11, United States Code, as such section applies to an action affecting the property of the estate in bankruptcy."

**18.** Which provides: "Nothing in this section prevents a district court in the interest of justice, or

in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11."

**19.** See note 17, *supra*.

**20.** See *National Union Fire Insurance Co. of Pittsburgh, Pennsylvania v. Titan Energy, Inc.,* 57 B.R. 498 (Bkrtcy.W.D.Mo.1986), to the following effect: "The mandatory abstention statute, section 1334(c)(2), Title 28, United States Code, does not apply in actions in this case because it was filed before July 10, 1984. See section 122 of P.L. 98–353, to the pertinent effect that 'Section 1334(c)(2) ... shall not apply with respect to cases under title 11 of the United States Code that are pending on the date of enactment of this Act, or to proceedings arising in or related to such cases.' The Titan Energy, Inc., title 11 was filed on May 23, 1984. The effective date of the Act was July 10, 1984. The permissive abstention statute, section 1334(c)(1), Title 28, United States Code, applies, however, and it is difficult to believe that, in passing on the question of permissive abstention, the district court would not be swayed by the letter of section 1334(c)(2), *supra*, in deciding whether it might not be an abuse of discretion not to abstain."

which was considered to have granted the widest bankruptcy jurisdiction in history, the district court could not assert bankruptcy jurisdiction over a controversy between strangers to the estate over property which was not that of the estate.[21] Only the court which had the actual *res* of the bankruptcy estate in its possession—the bankruptcy court—could exercise the inherent, nonstatutory jurisdiction to issue the orders and judgments which were necessary to protect that *res*.[22]

Therefore, if this action is to be decided in the federal courts, it is the bankruptcy court which must assume jurisdiction of it and determine it. The assumption of such jurisdiction is wholly possible under the "catch-all" provisions of Section 157(b), Title 28, United States Code.[23] But those "catch-all" subsections have uniformly been interpreted as defining "related" cases which a bankruptcy court, under section 157(c)(1) of the same title, may hear but not determine.[24] As observed above, however, the rule of necessity demands that the bankruptcy court must determine this action as well as hear it; otherwise, according to the creditable contentions of the

trustee, estate administration will either be impossible or so greatly hindered that the purpose of that administration will be defeated.

### The Constitutional issue

To interpret the "catch-all" provisions to permit determination by the bankruptcy court of this action, which arises solely under state law, however, directly confronts the rule of *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), which prohibits such determinations by non-Article-III courts. Nevertheless, the rule of necessity which, as observed above, applies in this action demands that a basis for jurisdiction be found.

This court cannot pretend, of its own volition, to any special status under the Constitution of laws of the United States. That is a determination which must be left, under most imaginable circumstances, to the district and appellate courts.[25] It can only be observed that, under the statutory scheme which is now in effect, the bankruptcy courts are increasingly required, by application of that statutory scheme, to

---

**21.** See note 4, *supra.*

**22.** During the period of the interim rule, the bankruptcy court exercised inherent nonstatutory jurisdiction because of the striking by the Supreme Court, in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), of the subsections of section 1471, Title 28, U.S.C., which conferred bankruptcy court jurisdiction. See, e.g., *Matter of Isis Foods, Inc.*, 26 B.R. 122 (Bkrtcy.W. D.Mo.1983); *Matter of Brown*, 26 B.R. 119 (Bkrtcy.W.D.Mo.1983).

**23.** See Sections 157(b)(2)(A) and (O), Title 28, United States Code, which respectively provide: "Core proceedings include, but are not limited to—matters concerning the administration of the estate;" and "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims."

**24.** See, e.g., *In re Castlerock Properties*, 781 F.2d 159, 162, 1986 CCH Bankruptcy Law Reporter Para. 70,970, pp. 88,461; 88,462 (9th Cir.1986), holding as follows: "State law contracts claims

that arguably fall within either of these catch-all provisions [Section 157(b)(2)(A) or 157(b)(2)(O)] have been held to be 'noncore' 'related' proceedings under Section 157(c) ... we hold that state law contract claims that do not specifically fall within the categories of core proceedings enumerated in 28 U.S.C. Section 157(b)(2)(B)–(N) are related proceedings under Section 157(c) even if they arguably fit within the literal wording of the two catch-all provisions, Sections 157(b)(2)(A) and (O). To hold otherwise would allow the bankruptcy court to enter final judgments that this court had held unconstitutional." *In re Castlerock, Properties*, 781 F.2d 159, 162, 1986 CCH Bankruptcy Law Reporter Para. 70,970, pp. 88,461, 88,462 (9th Cir.1986).

**25.** But a court's own opinion as to whether it is a constitutional court has been accorded some weight by the Supreme Court in making the determination. "The judges of these two courts have never accepted the dependent status thrust at them by the *Bakelite* and *Williams* decisions. See, e.g., Judge Madden writing for the Court of Claims in *Pope v. United States*, 53 F.Supp. 570, 100 Ct.Cl. 357, rev'd, 323 U.S. 1, 65 S.Ct. 16, 89 L.Ed. 3." *Glidden Company v. Zdanok*, 370 U.S. 530, 82 S.Ct. 1459, 1490, 8 L.Ed.2d 671 (1962).

take jurisdiction of types of cases which have been ordinarily thought as those which belong in courts of general jurisdiction. See, e.g., *Matter of Brewer,* 65 B.R. 75. In proceedings for straight liquidation under chapter 7 of the Bankruptcy Code (Bkrtcy.W.D.Mo.1986), to the following effect:

"This court has previously observed that the adsorption of state law actions into bankruptcy law is a process which—once found permissible—contains no visible 'limiting principle,' within the meaning of *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., supra,* which prevents the Congress from remaking all relevant state actions into federal actions by statute and assigning them all to sub-Article III courts which may be controllable by the legislative branch of government. See, e.g., *Matter of Richardson, supra,* [52 B.R. 527] at 537 [ (Bkrtcy W.D.Mo.1985) ]. But, even if this absence of the limiting principle which the plurality opinion found to be vital and necessary in *Marathon, supra,* should require a court having the attributes of an Article III court, then it must be mentioned that the federal district and appellate courts regularly assign such attributes to the bankruptcy court. Needless to say, time restrictions permit the mention of only a few of these in this opinion. But they include a ruling that the bankruptcy courts, like Article III Courts and unlike non-Article III courts, may not issue advisory opinions, *Matter of Hamilton,* Civil Action No. 83–6070–CV–SJ (W.D.Mo. May 14, 1984); see also *Matter of Transport Clearings-Midwest, Inc.,* 41 B.R. 528, 539 (Bkrtcy.W.D. Mo.1984); a ruling that the bankruptcy court, rather than the district court, should initially determine a claim based on agency principles arising under state law, *Matter of Walker,* 726 F.2d 452 (8th Cir.1984); a ruling that the bankruptcy court occupies the position of the initial trial court in the federal judicial hierarchy and, under the statutes governing bankruptcy appeals, an appeal from a district court decision to the appellate court cannot be made unless there was an initial appeal of the same issue from a bankruptcy court decision, *In re Benny,* [791 F.2d 712] 1986 CCH Bankruptcy L.Rep. Para. 71.178 (9th Cir.1986); a ruling that the 'clearly erroneous' standard of review implies that the bankruptcy court has powers greater than those possessed by pure Article I courts, see. e.g., *In re AOV Industries, Inc.,* [792 F.2d 1140] 1986 CCH Bankruptcy L.Rep. Para. 71.190 (D.C.Cir. June 6, 1986); and a recognition that the applicable statutory scheme of the Bankruptcy Amendments and Federal Judgeship Act of 1984 grants the bankruptcy court the sole power to enjoin state court actions against trustees and other offices of a bankruptcy estate. *Matter of Burstein-Applebee,* [63 B.R. 1011] Adversary Action No. 85–0052–3 (Bkrtcy.W.D.Mo. May 15, 1986). The distinction between the types of cases determinable by Article III courts and the bankruptcy courts daily grows more blurry; and consequently, this court may act with some self-assurance that it has jurisdiction of the action at bar."

Under similar circumstances, historically, it has ordinarily been held that the assignment to a non-Article-III court by statute of any portion of the judicial power of the United States, other than by inadvertence [26], may convert that court into an Article III court, regardless of the prior status of the judges of that court. The law on this subject has been previously summarized as follows:

"It has historically been held that the designation placed by Congress on a court as an Article III court or a non-Article III court is not controlling; the question is whether any of the federal judicial power is conferred upon the

---

**26.** When Congress knew of the constitutional prohibitions imposed by the *Marathon* decision, it would be difficult to hold that assignment of judicial powers to the current bankruptcy court was anything but knowing and deliberate.

court in question. 'In determining the constitutional character of the Court of Claims and the Court of Customs and Patent Appeals ..., we may not disregard Congress' declaration that they were created under Article III ... [but] Congress may not by fiat overturn the constitutional decisions of this Court.' *Glidden Company v. Zdanok*, 370 U.S. 530, 541, 82 S.Ct. 1459, 1468, 8 L.Ed.2d 671 (1962). It has historically not been the status of the judges of a court which determines the status of that court; rather than the converse is so—the status of the court determines that of its judges.

'If it were plain that these judges were invested upon confirmation with Article III tenure and compensation, it would be unnecessary for present purposes to consider the constitutional status of the Court of Claims and the Court of Customs and Patent Appeals ... [but] the constitutional quality of tenure and compensation extended Judges Madden and Jackson at the time of their confirmation must be deemed to have depended upon the constitutional status of the courts to which they were primarily appointed.'

Id. at 538, 540, 541, 82 S.Ct. at 1466, 1467, 1468.

'[T]he District Court employed the wrong test for determining whether Congress had created an Article III court ... [that test] comes "dangerously close to saying that Article III courts are those with Article III judges ..." [and] all of the opinions filed in the Court's latest Article III case, *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 [102 S.Ct. 2858, 73 L.Ed.2d 598] ... (1982), agree that it is not what Congress says but what powers Congress vests in the adjudicatory body that counts.'

*Kalaris v. Donovan*, 697 F.2d 376, 385 (D.C.Cir.1983).

In accordance with this guiding principle, it has in the past been held that a court initially created as a non-Article III court may 'mature' into an Article III court by reason of being assigned a portion of the federal judicial power.

'[P]rior to 1953 the Court of Claims had all of the characteristics of an Article III court—jurisdiction over justiciable matters, issuance of final judgments, judges appointed by the President with consent of the Senate—save as to the congressional reference matters ... Since that time the Article III jurisdiction of the court has been enlarged ... I see nothing in the argument that the 1953 and 1958 Acts so changed the character of these courts as to require new presidential appointments. Congress was merely renouncing its power to terminate the functions or reduce the tenure or salary of the judges of the courts. Much more drastic changes have been made without reappointment.'

Id. at 586, 587, 589, 82 S.Ct. at 1491, 1492, 1493. And if a court does mature in such a manner, it is clear that its judges become Article III judges, without the necessity of reappointment, regardless of the character of their initial appointment. *Id.* See also *Booth v. United States*, 291 U.S. 339, 54 S.Ct. 379, 78 L.Ed. 836 (1934).

Accordingly, it is clear that, if this court should assert that it has jurisdiction and power to enforce its orders by means of contempt proceedings or other sanctions, it would be seen as the bankruptcy court's arrogating Article III powers to itself in violation of *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, supra.

It is necessarily, in light of the foregoing principles, the precise or tacit assumption of the decisional authorities relied on by the Government, which hold the provisions of Section 1927, Title 28, United States Code, applicable to the bankruptcy court, that the bankruptcy court is a 'court of the United States,' i.e., according to the foregoing authorities, an Article III court. It must be admitted that there is ample precedent for concluding that the bankruptcy court

must have, by this time, as a constitutional imperative, 'matured' into an Article III court. Twenty years ago, the standard for determining this issue was simply whether, in any part, a court's business was 'judicial,' i.e., capable of resolution only by a court and incapable of determination by legislature or administrative action. *Kalaris v. Donovan, supra.* Thus, if the decisions rendered by a federal court were properly in controversies judicially cognizable between litigants and were not comprised wholly of issuing advisory opinions or adjudicating 'public rights,' the federal court was required to be recognized as an Article III court.

> '[T]he Court of Claims [and] the Court of Customs and Patent Appeals ... are not tribunals ..., a substantial and integral part of whose business is non-judicial. The overwhelming majority of [their] business is composed of cases and controversies.'

*Glidden Company v. Zdanok, supra,* 370 U.S. at 582, 583, 82 S.Ct. at 1489, 1490. In asseverating this principle, the Supreme Court of the United States, in *Glidden Co. v. Zdanok, supra,* relied in part upon the Court of Claims opinion in *Pope v. United States,* 53 F.Supp. 570, 100 Ct.Cl. 375, *rev'd,* 323 U.S. 1, 65 S.Ct. 16, 89 L.Ed. 3, stating as follows in doing so:

> 'The judges of these two courts have never accepted the dependent status thrust at them by the [Ex parte] *Bakelite* [*Corp.,* 279 U.S. 438, 49 S.Ct. 411, 73 L.Ed. 789] and *Williams* [*v. United States,* 289 U.S. 553, 53 S.Ct. 751, 77 L.Ed. 1372] decisions. See e.g., Judge Madden writing for the Court of Claims in *Pope v. United States,* 53 F.Supp. 570, 100 Ct.Cl. 375, *rev'd,* 323 U.S. 1, 65 S.Ct. 16, 89 L.Ed. 3. The factors set out at length in this opinion, which were not considered in the *Bakelite* and *Williams* opinions, make plain that the differing conclusion which we now reach does no more than confer legal recognition upon an independence long exercised in fact.'

370 U.S. 584, 82 S.Ct. at 1490. The *Pope* case, in turn, classified the duties of the Court of Claims to be judicial simply by reason of their being subject to review in Article III courts. Judge Madden's now famous words in that case were as follows:

> 'We do not attempt to explain the decision in the *Williams* case [holding the Court of Claims not to be an Article III court], because, and we say it with deference, we do not pretend to understand it. In any event, the language of the Supreme Court in the *Williams* case, and the fact that that language was uttered in the course of the decision of a case certified to the Supreme Court by this court, would seem to leave no room for doubt that this court is a court in fact as well as in name, and that its decisions are judicial decisions. If it were not, the Supreme Court would not review its decisions, as it does, and has done since the amendment, in 1866, 14 Stat. 9, of the statute defining the jurisdiction and powers of this court ... And we would suppose, unless the decision in the *Williams* case means the contrary, that we are no more acting as a mere agent or arm of the legislature, when we decide our cases in the first instance, than is the Supreme Court, when it, under the appellate procedure prescribed in the statute, decides them finally. Each court is assigned its place in the process of doing justice between the United States and those who have claims against it. That is the major portion of this court's assignment. It is only a small part of the Supreme Court's assignment. But one, when it is performing that assignment must be acting judicially, if the other is.'

53 F.Supp. at 573. Judged by this simple, straight-forward and sensible standard, the claim of the current bankruptcy court to Article III status is many times greater than that of the Court of Claims, which is a legislative court, a species of

tribunal which has traditionally been recognized as an exception to the rule that the federal judicial power can be conferred only on Article III courts."

*Matter of Richardson,* 52 B.R. 527, 533, 535 (Bkrtcy.W.D.Mo.1985). See also *Matter of Burstein-Applebee Co.,* 63 B.R. 1011 (Bkrtcy.W.D.Mo.1986), to the following effect:

"It is plain that the Supreme Court of the United States has held that it is an unconstitutional conferring of the federal judicial power for Congress by statute to confer on a non-Article III court the jurisdiction to determine an action which arises under State law. '[W]hen Congress creates a statutory right, it clearly has the discretion, in defining that right, to create presumptions, or assign burdens of proof, or prescribe remedies; it may also provide that person seeking to vindicate that right must do so before particularized tribunals created to perform the specialized adjudicative tasks related to that right. Such provisions do, in a sense, affect the exercise of judicial power, but they are also incidental to Congress' power to define the right that it has created. No comparable justification exists, however, when the right being adjudicated is not of congressional creation.' *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 93 [102 S.Ct. 2858, 2883, 73 L.Ed.2d 598] (1982). There can be little doubt that the action resolved by the granting of this injunction is one arising under state law—one, in fact, which is currently pending in state court and as to which this court must apply the state law of privilege as the rule of decision in order to issue the injunction which is necessary to preserve the bankruptcy process. Under the historical circumstances which provide the background for this action, however, the rule of *Marathon, supra,* may as well provide a basis for concluding that the delegation of this power to the bankruptcy court confers constitutional status upon that court as it may provide a basis for holding the statute unconstitutional as applied in this case.

It must be remembered that construing the statute as constitutionally conferring the jurisdiction and power seems necessary to the effectuation of the purpose of the national bankruptcy laws. Further, the ordinary presumption to be indulged by trial courts is that a statute is constitutional. And, finally, Congress seems to have conferred these powers on the bankruptcy court with full knowledge of the risk of any miscalculation under the *Marathon* rule, *supra.*"

Whatever the rationale for this court's assuming and exercising jurisdiction of this case, however, it is imperative that this court proceed to a determination of it. As this court has previously indicated, in *Matter of Transport-Clearings-Midwest, Inc.,* 41 B.R. 528, 536, 537, 539 (Bkrtcy.W.D.Mo. 1984):

"[If the bankruptcy court] must somehow be held to be qualified to exercise the jurisdiction of an Article III court or else indulge in the vain exercise of void jurisdiction ... it is incumbent upon the court at this juncture, in view of the claimant's persisting demands for action, to find a rational basis for its exercise of the federal judicial power, if possible. In this regard, it is sometimes said that a non-Article III court may exercise the federal judicial power for a transitory period ... [T]o date, that doctrine has been held to be applicable only in territories and nascent states where local exigencies are such that territorial courts are the only courts available to exercise the federal judicial power ... [But, in this case], the bankruptcy court may rely upon a ... recent decision of our district court in *Matter of Hamilton,* Civil Action No. 83–6070–CV–SJ (W.D.Mo.1984), in which it was held that the bankruptcy court has no power to render advisory opinions. This seems to recognize—if not the constitutional power of the bankruptcy court—at least its' authority to render decisions in an exercise of the federal judicial power. For it is only constitutional courts which cannot render advisory opinions. 'A federal court

which is not subject to the limitations of Article III may, of course, be required to render an advisory opinion.' 6A Moore's Federal Practice para. 57.12, p. 57–109, n. 2."

## Findings of Fact

The facts of this action, once reached, are comparatively simple and require little amplification. The defendant Elliott-Ottinger Construction Company commenced its work on the debtor's building, the Phillips Hotel, preparatory to an extensive remodeling of the interior heating, cooling and plumbing systems in September 1979. The uncontradicted testimony which has been adduced in the hearings conducted by the court on the merits of this action [27] shows that the work which was actively commenced at this time was principally on the heating, cooling, water and other utility systems in the building, work in the nature of disconnecting the crucial parts of that system preparatory to making actual structural changes.[28] By May 1980, a commitment had been made to continue working on the extensive remodeling project until its completion.[29] At the same time, actual alterations in the structure of the building came to be made and became obvious and visible to the naked eye.[30] By this stage of the process, the work had become substantial and quite manifest. And it was only thereafter, on June 3, 1980, that the deed of trust of Boatmen's Bank was filed for record in the office of the appropriate coun-

ty recorder. At a later time, the James K. Lynch Design Associates, Inc. provided materials and services which were incorporated into the building.[31] The evidence further shows that, almost from the time that Elliott-Ottinger Construction Company commenced its repair and remodeling work on the building, a responsible and authorized official of the Boatmen's Bank and Trust Company regularly and repeatedly authorized payments to the Elliott-Ottinger Construction Company, with knowledge that the repair and remodeling work was being done.[32]

## Conclusions of Law

■ On the basis of these material facts, it is clear that the court must conclude that the mechanic's and materialmen's liens of Elliott-Ottinger Construction Company and James K. Lynch Design Associates, Inc., have priority over the mortgage (or deed of trust) lien of the Boatmen's Bank and Trust Company. See Section 429.080 RSMo. as follows:

"The lien for work and materials as aforesaid shall be preferred to all other encumbrances which may be attached to or upon such buildings, bridges or other improvements, or the ground, or either of them, subsequent to the commencement of such buildings or improvements."

See also *H.B. Deal Construction Co. v. Labor Discount Center, Inc.,* 418 S.W.2d 940, 951 (Mo.1967), to the following effect:

27. On January 13, 1986, March 31, 1986, and April 1, 1986.

28. The contract between Elliott-Ottinger Construction Company and Phillips House under which the former was to renovate the hotel building was signed on October 31, 1979. In turn, Elliott-Ottinger made subcontracts, including that with James K. Lynch Design Associates, Inc. Renovation of the hotel's heating, ventilation, air-conditioning and plumbing systems was to be accomplished. Preparatory work began even before the signing of the written contract, in order to determine the fair price of the job.

29. The evidence is uncontradicted to this effect and the contract had been signed as far back as October 31, 1979. See note 28, *supra.*

30. At least by May 1980, portions of almost all the floors, ceilings and walls in the building had been removed in order to replace plumbing.

31. Other subcontractors have assigned their claims to Elliott-Ottinger Construction Company.

32. The evidence of record shows that one Jovena Anderson, an authorized corporate trust officer of the bank, approved payments to James K. Lynch Design Associates, Inc., on account of the work performed, at least by March 1981. By then it was in such a state that it should have been known that its beginnings would have had to antedate June 3, 1980.

"A mechanic's lien properly filed dates from the commencement of the building or improvement, Section 429.060 ... The commencement of the building or improvement, under the 'first spade rule' which we recognize in this state, means the visible commencement of actual operations on the ground for the erection of the building or the making of the improvement which makes it apparent that a building has been commenced or that an improvement is to be made, done with the intention and formed purpose to continue the work until completed."

It is true that the improvements, for the lien to attach, must be obvious or visible.[33] "The fact of the improvement gives its own notice to all the world. This notice is imparted by the commencement of the building as well as by any later contribution to the structure." *Hydraulic Press Brick Co. v. W.A. Bormans,* 19 Mo.App. 664, 669 (Mo.App.1885). With respect to improvements, as opposed to the commencement of a building, the cases appear to impose less in the way of obviousness or "visual" design.[34] But, even under the most exacting requirements in this respect, it is clear from the evidence that the lien of Elliott-Ottinger Construction Company was perfected prior to June 3, 1980, for the work accomplished in May 1980 should have been obvious to the most inexperienced eye.[35]

Further, according to the evidence, Boatmen's Bank and Trust Company had actual knowledge of the improvements almost from the time of their commencement, by reason of their authorized officer approving the payment of monies to the materialmen.[36] See C.J.S. *Mechanic's Liens* Section 200(d), p. 756 (1948), where it is said:

"[I]t is not necessary for a materialman to have completed the contract before the creation of the subsequent encumbrance, for it is generally held that a mechanic's lien has priority over a mortgage or other like encumbrance attaching after the commencement of the work or the furnishing of the materials out of which the lien arose, *especially where, prior to, and at the time of, taking the mortgage the mortgagee had knowledge that work had commenced, or had actual notice of a materialman's claim of lien."*

For those same reasons, the mechanic's lien of James K. Lynch Design Associates, Inc., is also prior to the security interest of Boatmen's Bank and Trust Company. "All the mechanics' liens commence at the date of the first stroke of the axe or spade, and continue in the erection of the house, without regard to the time of their being filed, or of doing the work or furnishing the materials. The man who does the last painting or plumbing comes *in pari passu* with him who built the foundation wall." *Hammond v. Darlington,* 84 S.W. 446, 449 (Mo.App.1904).

It is therefore, for the foregoing reasons,

ORDERED, ADJUDGED, AND DECREED that the mechanic's and materialmen's liens of the defendants Elliott-Ottinger Construction Company and James K. Lynch Design Associates, Inc., be, and they are hereby, declared to have priority over the security interest of the defendant Boatmen's Bank and Trust Company.

---

**33.** As the defendant Boatmen's Bank of Kansas City has observed, the Missouri courts have defined "commencement" of work on the building to mean "[t]he visible commencement of actual operations on the ground for the erection of the building or the making of the improvement which makes it apparent that a building has been commenced or that an improvement is to be made, done with the intention and formed purpose to continue the work until completed."

*H.B. Construction Company v. Labor Discount Center, Inc.,* 418 S.W.2d 940, 951. (Mo.1967).

**34.** See, e.g., *Hydraulic Press Brick Co. v. W.A. Bormans,* 19 Mo.App. 664 (Mo.App.1885).

**35.** See note 30, *supra.*

**36.** See note 32, *supra.*